COURT OF APPEALS
DECISION
DATED AND FILED

April 21, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2265-CR**

Cir. Ct. No. 2017CF393

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

   PLAINTIFF-APPELLANT,

V.

MICHAEL K. JUSTICE,

   DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Marathon County: LAMONT K. JACOBSON, Judge. *Reversed and cause remanded with directions*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. The State of Wisconsin appeals an order granting Michael K. Justice's postconviction motion for a new trial and vacating his

convictions on the ground that Justice's trial counsel was constitutionally ineffective. Justice was convicted, following a jury trial, of 2 counts of repeated sexual assault of a child, 2 counts of child enticement, and 2 counts of causing a child under the age of 13 to view/listen to sexual activity.[1] The State argues that Justice's trial counsel was not ineffective and that the circuit court erroneously applied the ineffective assistance of counsel analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

¶2     We agree with the State and conclude that Justice's trial counsel was not constitutionally ineffective. We also reject Justice's alternative basis to affirm the circuit court's order, in which he contends that the court erroneously exercised its discretion by excluding evidence relating to one of the victims. Accordingly, we reverse the order granting Justice a new trial and vacating his convictions, and we remand the case for the circuit court to reinstate Justice's judgment of conviction.

## BACKGROUND

¶3     According to the criminal complaint, in 2017, Cliff and James,[2] who are brothers, alleged that Justice, whom they knew as "Kevin," repeatedly sexually assaulted them and showed them pornography when their family lived in an apartment below Justice's apartment. According to Cliff's and James's trial

---

[1] The State had also charged Justice with an additional four counts of exposing genitals or pubic area, but those counts were removed in an amended information.

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), we use pseudonyms when referring to the victims and their parents in this case. All references to the Wisconsin Statutes are to the 2023-24 version.

2

testimony, the alleged assaults occurred between 2012 and 2013, when Cliff was between seven and eight years old and James was between five and six years old.

¶4    The allegations arose during a separate law enforcement investigation into allegations that Cliff himself had sexually assaulted another child. Officer Leah Long interviewed Cliff at his school, during which he initially denied any sexual misconduct with the other child, alleged that the other child and James were the ones who engaged in sexual activity with each other, and ultimately admitted that he did engage in sexual activity with the other child. After being questioned about where he got the idea and denying that he and James had touched each other in a sexual manner, Cliff stated that they had an upstairs neighbor (Justice) who sexually assaulted them.

¶5    Prior to trial, the State moved, pursuant to WIS. STAT. § 972.11(2), to exclude any evidence relating to Cliff's and James's alleged sexual misconduct noted in Officer Long's interview. Justice's defense counsel acknowledged that such evidence would be inadmissible under § 972.11(2), but he argued that Cliff's allegations regarding Justice in response to continued questioning by Long were admissible. Defense counsel explained that he could introduce that evidence without mentioning Cliff's alleged sexual misconduct by eliciting testimony that Long went to Cliff's school "to question [Cliff] about some unspecified inappropriate or concerning behavior or conduct by [Cliff] in relation to the other minor boys." Counsel further explained that providing this context showed that Cliff's allegation against Justice was not a voluntary disclosure and that Cliff knew he "was responding to questions from [Long] about his own behaviors of a potentially improper or concerning nature."

3

¶6     Also prior to trial, Justice moved to admit evidence that James viewed pornography on his tablet in May 2014. The circuit court denied the motion, concluding that the evidence, "if it has any relevancy at all, would be outweighed by the potential for unfair prejudice." For the same reason, the court also denied defense counsel's pretrial request to ask Officer Long questions regarding law enforcement's failure to investigate James's alleged viewing of pornography. Long did not testify at the subsequent trial. Defense counsel used Long's report regarding her interview with Cliff only to refresh a witness's memory, but counsel did not offer the report into evidence.

¶7     The case proceeded to a five-day jury trial. The trial testimony and exhibits established that Justice moved into his apartment on May 1, 2012, and moved out on December 21, 2013, and that Cliff and James's family moved into their apartment on June 9, 2012, and moved out on April 25, 2016.

¶8     Mitchell and Samantha, who were Cliff and James's parents, testified that their family had a close relationship with Justice, their former upstairs neighbor whom they knew as Kevin. Mitchell described Justice as "a brother." Mitchell and Samantha also testified that Justice would watch Cliff and James while they ran errands and that Cliff and James would go to Justice's apartment to "hang out" and play video games. They further testified that Justice eventually moved away, that Mitchell and Justice continued to communicate regularly, and that their friendship ended in 2017, when Cliff's and James's allegations came to light. Samantha recalled that she informed Cliff and James that they were going to be interviewed about an old neighbor and that when she mentioned an old neighbor, James began to cry.

¶9      The State introduced both Cliff's and James's forensic interviews through Alicia Resch, the forensic interviewer at the Child Advocacy Center, and it played those interviews, which Resch conducted, for the jury. Resch testified that forensic interviews are "a developmentally appropriate and legally sound way of collecting information and interviewing children about alleged abuse or victims of a crime," and she described how those interviews are conducted. The State also introduced a document on which James had written during his forensic interview and two diagrams on which James drew where Justice had touched him and where James had touched Justice.

¶10     Cliff testified that he and James would go to Justice's apartment to play video games when their parents went out. Cliff stated that he and James would also watch movies of people "touch[ing] each other with their private parts with their mouths and their hands" on Justice's laptop in Justice's spare bedroom. Cliff then described several instances in which he and Justice would go into Justice's bedroom while James remained in the living room, and Justice would tell Cliff to take off his clothes and then touch Cliff's penis with his mouth. Cliff testified that Justice's clothes were on when this occurred and that Cliff would lie on Justice's bed while Justice sat in between Cliff's legs.

¶11     On cross-examination, Cliff could not recall whether Justice took him and James into the spare bedroom to watch pornography or whether he and James went to that room on their own. Cliff could also not recall several details about the assaults, such as what furniture was in the bedroom, where Justice stood in the bedroom when telling Cliff to take off his clothes, whether Justice left the bedroom door open while James was in the living room, how his and Justice's legs and arms were positioned on the bed, and which way Justice faced. Cliff also

admitted that Justice had a "big stomach" and that it would be "pretty hard" for Justice to sit between Cliff's legs and put his mouth on Cliff's penis.

¶12     Cliff also testified that he spoke "to a police officer at school about what [Justice] did." On cross-examination, Cliff added that a police officer came to his school to talk to him; that she pulled him out of class to talk to him; and that she wore a uniform, had a gun, and had a badge. He further testified that when he was pulled out of class he was "a little uncomfortable being spoken to by a uniformed police officer" and that speaking to her was "a little nerve-racking." Cliff then testified that he was worried he might have been in trouble.

¶13     James's testimony was consistent with Cliff's in that he stated they would go to Justice's apartment to play video games when their parents went out and that they watched videos of "people who were not dressed" and were touching each other with their hands and their "private parts." James testified, however, that he, Cliff and Justice would watch the videos on Justice's laptop either on Justice's couch in the living room or in Justice's bedroom. James also testified that after watching the videos, Justice would tell either him, Cliff, or both of them to take off their clothes, and they would "do some of the stuff that they did in the video."

¶14     James recalled that Justice would assault him either on the couch or the bed and that Justice would touch him "in ways that they did in the videos," that Cliff would be playing video games while Justice assaulted James, and that Justice would tell James not to tell anyone because Justice could go to jail. James testified that Justice would "stroke" and "pet" James's back, chest, backside and penis and that Justice would touch these areas with his mouth. James recalled that he would "stroke" and "pet" Justice's stomach, penis and backside in the same

way. James described that during the assaults, he would sit on top of Justice near his head and that Justice would touch James's penis with his mouth. On cross-examination, James stated that he, Cliff and Justice did not go into the spare bedroom to watch videos and that none of the assaults occurred in that bedroom.

¶15 Heidi Schmidt, a school counselor and the mother of James's best friend at the time of the trial, and Sarah Thompson, Cliff and James's former teacher and their former neighbor, both testified about Cliff and James's general character for truthfulness. On cross-examination, Schmidt admitted she did not know whether anything happened to James between 2012 and 2013 "that could have prompted criminal charges," and Thompson admitted that she did not know anything that happened in Cliff's and James's lives in that period other than what she saw in school.

¶16 Justice called Dr. David Thompson to testify about best practices when conducting child forensic interviews, focusing specifically on the types of questions an interviewer asks. Doctor Thompson compared the number of question types that Resch asked Cliff and James with the number of question types recommended for best practice, and he concluded that Resch "strayed significantly" from best practice. Doctor Thompson also opined on the efficacy of the types of questions Resch asked.

¶17 Justice testified in his own defense, and he denied sexually assaulting and showing pornography to Cliff and James. Justice stated that he lived in North Carolina for most of his life, except for 19 months that he spent in Wisconsin. Justice stated that he became good friends with Mitchell and his family and that Mitchell would visit him often. Justice added that his door was usually unlocked unless he was not home, so whenever Mitchell visited, he could

simply walk into Justice's apartment. This practice was consistent with Mitchell's testimony that when he visited Justice, the door to his apartment would usually be unlocked.

¶18    Justice also testified that he would watch Cliff and James when Mitchell and Samantha were running errands or at work, that he would sometimes invite Cliff and James to his apartment, and that they would usually spend time in the living room. Justice further testified that Cliff and James would sometimes go into his spare bedroom to play with his collectibles but that he would stop them because the collectibles were not toys. He added that he never kept a computer in the spare bedroom and that Cliff and James never went into his bedroom.

¶19    Justice also testified that he was arrested in May 2017, and, at that time, he had no idea why he was being arrested. He noted that the arresting officers never asked him whether he wanted to talk about the charges and that one of the police reports inaccurately described him as "bow[ing his] head in shame" when he was placed under arrest. The State's rebuttal witness, Patrick Raynor, a special agent from the North Carolina State Bureau of Investigation, testified that when he informed Justice of the charges for which he was being arrested, Justice "dropped his head," said nothing, and turned around so officers could handcuff him.

¶20    The jury found Justice guilty of all six charges. The circuit court subsequently imposed a sentence totaling 18 years of initial confinement followed by 18 years of extended supervision.

¶21    Justice filed a postconviction motion seeking a new trial based on a violation of his right to present a defense, prosecutorial misconduct, and ineffective assistance of his trial counsel. Relevant here, Justice argued that the

circuit court erroneously excluded the evidence of James viewing pornography in 2014 as an alternate source of James's sexual knowledge and that this evidence was central to his defense. Justice also argued that his trial counsel was constitutionally ineffective because he: (1) failed to present evidence regarding the investigation of Cliff's alleged sexual misconduct, "which provided the background and potential motive for [Cliff's and James's] accusations against [Justice]"; (2) failed to "adequately implement his alternative strategy of presenting evidence that the boys were under investigation for wrongdoing and lied to police"; (3) failed to object to improper opinion testimony by Schmidt and Sarah Thompson; (4) "opened the door to questions and arguments infringing on [Justice's] right to silence"; and (5) failed to "object to misconduct in closing arguments."[3]

¶22 The circuit court held a *Machner*[4] hearing, at which both Justice and defense counsel testified. Counsel explained that his theory of defense was that of reasonable doubt, and one where Justice "was adamant that he didn't do it, he always maintained his innocence." Implementing the defense included showing Cliff's and James's inconsistent statements; the physical difficulties of some of the acts that Cliff and James alleged; the delayed reporting; the lack of corroboration; and the lack of police investigation into Cliff's and James's allegations against Justice.

---

[3] Because the circuit court granted Justice postconviction relief based on ineffective assistance of trial counsel, and because Justice does not raise his prosecutorial misconduct claim as an alternative basis to affirm the court's decision, we do not address the prosecutorial misconduct claim further.

[4] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶23    Following additional briefing, the circuit court issued a written decision granting Justice's postconviction motion. The court found that defense counsel's "reasonable doubt" defense was an appropriate theory of defense, but it concluded that counsel was ineffective in implementing the defense. The court concluded that the investigation into Cliff's alleged sexual misconduct was highly relevant for assessing Cliff's credibility and that counsel's failure to present that evidence "undermined the stated theory of defense." The court also concluded that counsel's failure to object to Schmidt's and Sarah Thompson's testimony was deficient as a matter of law because counsel did not know the law regarding the admissibility of that testimony. The court further concluded that introducing Justice's testimony about his arrest allowed the State to argue that Justice's "post-arrest conduct was evidence of consciousness of guilt."

¶24    Based on the cumulative effect of these three deficiencies, the circuit court concluded that counsel's errors sufficiently undermined confidence in the trial's outcome because the evidence that defense counsel did not present likely would have diminished Cliff's and James's credibility in a case where the credibility assessment of witnesses was of enhanced importance and "there [was] little if any corroborating evidence." The State now appeals. Additional facts will be provided below as necessary.

**DISCUSSION**

¶25    On appeal, the State argues that the circuit court misapplied the *Strickland* analysis by ignoring defense counsel's reasonable explanations for his decisions that Justice claimed were deficient and by failing to explain why counsel's decisions were objectively unreasonable. The State further argues that Justice failed to establish that his counsel was ineffective because Justice simply

10

argued that his "postconviction counsel would have attempted to do some things trial counsel here did not do and not done some things that trial counsel did do."

¶26 An ineffective assistance of counsel claim requires a defendant to show both that his or her trial counsel's performance was deficient and that the deficient performance prejudiced the defense. *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. "Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact." *Id.* We uphold the circuit court's findings of fact, which include "the circumstances of the case and the counsel's conduct and strategy," unless they are clearly erroneous. *State v. Mull*, 2023 WI 26, ¶31, 406 Wis. 2d 491, 987 N.W.2d 707 (citation omitted). Whether counsel's conduct constitutes ineffective assistance is a question of law that we review de novo. *Breitzman*, 378 Wis. 2d 431, ¶37.

¶27 Because we conclude that defense counsel was not ineffective, we also address Justice's alternative argument that the circuit court erroneously exercised its discretion by excluding the evidence of James viewing pornography in 2014 and that the court's exclusion of that evidence violated Justice's right to present a defense.[5] We review a circuit court's decision to exclude evidence for an erroneous exercise of discretion. *State v. Chamblis*, 2015 WI 53, ¶20, 362 Wis. 2d 370, 864 N.W.2d 806. We uphold the court's decision if it "examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *Id.* (citation omitted). Whether the exclusion of evidence deprived the defendant of a constitutional right, however,

---

[5] Justice may raise this alternative argument without filing a cross-appeal because it provides an alternative basis to affirm the circuit court's order granting Justice a new trial. *See State v. Pico*, 2018 WI 66, ¶48 n.14, 382 Wis. 2d 273, 914 N.W.2d 95.

11

"is a question of constitutional fact subject to independent appellate review." *State v. Williams*, 2002 WI 58, ¶69, 253 Wis. 2d 99, 644 N.W.2d 919.

## I. Ineffective Assistance of Counsel

¶28 Trial counsel's performance is deficient when his or her representation falls below an objective standard of reasonableness considering all the circumstances. *Strickland*, 466 U.S. at 688. We strongly presume that "counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and we are highly deferential to counsel's strategic decisions as long as they are objectively reasonable, *Mull*, 406 Wis. 2d 491, ¶35. Importantly, "we do not review the reasonableness of trial counsel's decisions with 'the benefit of hindsight,'" and we do not "second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment." *Id.*, ¶35 (alteration in original; citations omitted). Rather, we evaluate "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

¶29 Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.* The defendant "need not prove the outcome would 'more likely than not' be different in order to establish prejudice." *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted). Rather, the defendant must show that "but for his [or her] lawyer's error, there is a reasonable probability the jury would have had a reasonable doubt as to guilt." *Id.*, ¶45. "If there is no reasonable

12

probability that the jury would have reached a different verdict," the defendant has not shown prejudice. *Id.*, ¶46.

### A. The Evidence of Cliff's Alleged Sexual Misconduct

¶30 The State first argues that defense counsel was not deficient for failing to present the details of the investigation into Cliff's alleged sexual misconduct because the evidence would not have been admissible pursuant to WIS. STAT. § 972.11(2). Even if that evidence were admissible, the State contends that counsel's decision not to seek its admission was a reasonable strategic choice. The details of those allegations, which we provide below, were set out in Officer Long's report, and a transcription of her interview with Cliff was attached to Justice's postconviction motion.

¶31 Officer Long's interview began with her asking Cliff if he had ever "touched" the other child. Cliff responded that he would have done so while playing tag or roughhousing. He did not respond when Long informed him that the other child had stated that Cliff touched his penis and asked Cliff whether that had occurred. When Long asked if Cliff had any regrets, he said, "Yeah," and began to cry. Cliff explained that James and the other child "would touch their private parts to their stuff" and that during a sleepover they touched each other's "private parts" with "their hands," but he denied participating in either of these acts.

¶32 When Officer Long informed Cliff that the other child had specifically referred to Cliff touching his penis and not James doing so, Cliff stated he had touched the other child's penis with his hand but that James "touched him more than me." Long then asked where Cliff got the idea about touching, and Cliff gave the following responses: he did not know; James and the other child

13

"made it up"; and it was James's idea. Cliff also denied that he and James had touched each other, but then he stated that they "had an upstairs neighbor that would. He would allow [James] to watch these videos." After discussing the content of the videos, what they would do at Justice's apartment, and how often they would go to that apartment, Long asked Cliff if "Kevin ever touch[ed] you," to which Cliff responded, "Yes."

¶33 We assume, without deciding, that the evidence of Cliff's and James's alleged sexual misconduct as detailed in Officer Long's report above was admissible. Nevertheless, we agree with the State that defense counsel was not deficient by deciding not to pursue that evidence at trial because that decision was a reasonable strategic one.

¶34 Justice's postconviction motion argued that defense counsel performed deficiently by failing to present the evidence of Cliff's and James's alleged sexual misconduct as support for their motive to lie about Justice's assaults. Justice explained that the evidence showed Cliff's motive to lie by shifting the blame to someone else and, by extension, James's motive to lie because Cliff implicated James in the alleged sexual misconduct involving the other child. Justice also contended that the evidence was relevant to Cliff's credibility because it showed he initially lied to Officer Long about the allegations that the other child made against Cliff.

¶35 The circuit court agreed, finding that the "scant" trial testimony about Cliff's interview with Officer Long excluded information that negatively impacted Cliff's credibility. Noting defense counsel's *Machner* hearing testimony that the reason he did not present the evidence was because he does not call children liars, the court stated that "information showing inconsistencies which

14

undermine the credibility of a witness does not require blatantly accusing someone of being a liar," and it concluded that Cliff's statements to Long could have supported the conclusion that Cliff was being untruthful. The court also found that Cliff implicated James in the sexual misconduct allegations, which showed either that James had a motive to lie about the allegations against Justice or that Cliff falsely accused his brother.

¶36 According to the *Machner* hearing testimony, however, avoiding calling the children liars was not defense counsel's only reason for not presenting the sexual misconduct evidence. Counsel made that statement in response to a question of whether his reasonable doubt defense included arguing that Cliff and James "were mistaken or lying." Instead of showing that Cliff and James had a motive to lie, counsel explained that he

> was trying to get the jury to see that the inconsistencies between them, as well as the improbability of some of the things they described, were part and parcel of the list of problems that were irresolvable on the record to the level of proof necessary beyond a reasonable doubt.

¶37 Defense counsel acknowledged that presenting a defense that Cliff and James had a motive to lie was one approach to the case, but "not necessarily one of the most compelling." He explained that he always expects the prosecutor to "get up at the end of the case and say why would he lie?" Rather than have the jury "just asking that question" in this case, counsel testified that he wanted the jury to also ask: "[H]ow does a naked man of 250 pounds sit on the sofa, knowing that the dad … is going to bound up at any moment?" In this case, counsel sought to achieve raising that question in the jury's mind by showing the implausibility of the physical descriptions by Cliff and James and the inconsistency in their allegations. Counsel also added that a "good part" of his defense strategy was

15

showing that "the police didn't care, they took them at their word. They went looking to record what they had to say … in front of the jury."

¶38 In sum, the focus of defense counsel's theory of defense was not necessarily to call Cliff and James liars or show that they had a motive to lie, but rather to show the implausibility of and inconsistencies in their descriptions and the lack of investigative work by law enforcement.

¶39 Given this focus, defense counsel testified that, based on his experience and discussions with a colleague, he decided not to present the evidence of Cliff's and James's alleged sexual misconduct with another child, despite Justice's disagreeing with that decision and despite counsel's belief that he could have successfully had the evidence admitted. Counsel explained:

> [I]f I could get the picture in front of the jury that [Cliff]— and also [James], but [Cliff] was confronted by a police officer, thought he was in trouble and because of that said what he said about [Justice], that that was better in the big picture than having a jury that had already exhibited incredible deliberate ignorance of the presumption of innocence, I had a better chance of avoiding them thinking that my client molested two boys who then went on to molest two or three other boys; that worried me more than not bringing out the actual information.
>
> … I made a strategic decision to dance as close to the line as I could and paint the picture I did and use that and the suggestiveness of [Officer Long's] questions … to have the jury wonder.

¶40 Defense counsel was reasonably concerned that the jury would infer that "molestation by Mr. Justice essentially caused" Cliff to "engage in inappropriate sexual behavior with other boys." Counsel stated that he did not "want the jury blaming [Justice] for" Cliff's sexual misconduct "because they might wonder how far it would go." Counsel believed that "[p]eople tend to know

16

now that children who are abused become abusers." Accordingly, counsel explained that he did not want that evidence "front and center" for the jury to deliberate "about how many kids might have been molested, because if that's where they start, if they hear that in the trial before they deliberate, then they get angrier at the man they already are convicting in their mind." Counsel further added that if he had presented the evidence and argued that Cliff "made this up to blame somebody else because of his own sexual misconduct, then the jury wants to come to the aid of the youth and say, he's calling him a liar when he was a victim, because that's where [the jury] start[s]."

¶41    In all, defense counsel provided reasonable strategic explanations for not presenting the evidence of Cliff's and James's alleged sexual misconduct. Despite counsel's belief that he could have succeeded in having the evidence admitted, he ultimately chose not to pursue that route because of his reasonable concerns regarding how the jury would view that evidence. That is, counsel was concerned about the jury's perception of counsel calling Cliff and James, who were children, liars and the risk that the jury would blame Justice for Cliff's and James's subsequent alleged sexual misconduct. Given these concerns, counsel chose to pursue a different defense by showing the inconsistencies in Cliff's and James's statements, the implausibility of their descriptions of the assaults, and the lack of law enforcement investigation. Given that counsel's decision not to present evidence of Cliff's and James's alleged sexual misconduct was a reasonable strategic choice, we are highly deferential to and do not second-guess it. *See Mull*, 406 Wis. 2d 491, ¶35.

¶42    Justice acknowledges that reviewing courts do not second-guess trial counsel's strategic decisions, but he argues that defense counsel's decision and reasons for not presenting the alleged sexual misconduct evidence were

unreasonable. He contends that counsel's decision "stripped away the contextual details of" Cliff and James's potential motive to lie, "leaving the jury with no evidence to evaluate its strength or plausibility, or that it extended to both brothers." He further contends that counsel's belief that the jury would infer that Justice's assaults caused Cliff and James to assault others "only works once the jury has already determined guilt on the charged crimes."

¶43 As defense counsel testified, however, showing that Cliff and James had a motive to lie was not part of counsel's reasonable doubt defense. And, as noted above, counsel made a reasonable choice not to introduce the evidence because of how the jury would view that evidence in relation to what Justice was alleged to have done and how it would react to counsel calling a child a liar. Counsel did so based on his perception of the jury at the time of trial and his experiences in child sexual assault cases.

¶44 Justice does not dispute counsel's decision to pursue a reasonable doubt defense but is instead arguing that counsel should have implemented it differently, and the State argues that the circuit court agreed. However, by doing so, Justice *is* simply second-guessing, with the benefit of hindsight, his counsel's "considered selection of trial tactics or the exercise of a professional judgment in the face of alternatives that have been weighed by trial counsel." *See State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983). Such second-guessing is not the standard for reviewing an ineffective assistance of counsel claim. *See Mull*, 406 Wis. 2d 491, ¶35. Thus, that defense counsel could have implemented his defense differently by introducing the alleged sexual misconduct evidence does not mean counsel's choice was unreasonable or that he performed deficiently.

¶45    Justice then argues that defense counsel failed to adequately implement his trial strategy because counsel's "restrictive approach avoiding any reference to sexual misconduct failed to present substantial non-sexual evidence that would have significantly undermined [Cliff's and James's] credibility." Specifically, Justice points to counsel's "failure to present Cliff's repeated lies to Officer Long" and Cliff's attempts to shift blame to James.

¶46    We conclude that defense counsel was not deficient in these regards. At the *Machner* hearing, counsel admitted that he did not ask Cliff questions about the fact that he lied to Officer Long because, again, he does not "accuse a child of being a liar." Had he done so, counsel continued, "[e]very mother on the jury and half the fathers would come to [Cliff's] defense emotionally. I rather them make the connection themselves." Counsel further explained that the questions he asked Cliff at trial achieved counsel's goal, which was "to have the jury have a picture of a boy called out of class by a cop in a uniform with a gun and a badge, think he was in trouble and whatever he has to say then is to clear him of whatever he did." Counsel successfully painted that picture when he asked Cliff at trial about his interview at school with Long. *See supra* ¶12.

¶47    Again, defense counsel's strategy did not include directly calling Cliff and James liars or noting that Cliff attempted to shift the blame for his alleged behavior because of how the jury would view that evidence. Justice suggests that counsel could have avoided calling Cliff a liar by having Officer Long testify, but, as the State points out, counsel would still have been calling Cliff a liar through Long's testimony. Again, Justice, with the benefit of hindsight, is simply second-guessing defense counsel's manner of implementing his reasonable doubt defense by arguing that counsel could have better presented the evidence of Cliff's interview with Long to undermine Cliff's and James's

credibility. But counsel clearly undermined their credibility through his strategy of thoroughly cross-examining Cliff and James, showing they were inconsistent as to the location of the assaults, the location of where they watched pornography, and, for Cliff in particular, the physical difficulty of the position in which Justice was alleged to have assaulted him.

¶48    In short, we conclude that defense counsel was not deficient for failing to present evidence of Cliff's and James's alleged sexual misconduct or for failing to adequately implement his trial strategy to have the jury find reasonable doubt as to Justice's guilt. Given that Justice has failed to show that counsel was deficient, we need not address the prejudice element of the ineffective assistance of counsel analysis. *See State v. Pico*, 2018 WI 66, ¶20, 382 Wis. 2d 273, 914 N.W.2d 95.

### B. Justice's Testimony

¶49    The State next argues that the circuit court failed to defer to defense counsel's strategic choice to elicit Justice's testimony regarding his actions at the time of his arrest. At trial, Justice testified that when officers came to arrest him, they informed him they had an arrest warrant from Wisconsin for "[a]ll kinds of child sex stuff." Justice described feeling "flabbergasted" and not knowing what to say. He also believed it was a joke by some of the law enforcement officers he trained, but it became clear that it was not a joke once they patted him down and placed handcuffs on him.

¶50    Defense counsel then asked whether the officers asked Justice if he wanted to talk about the charges, to which Justice responded, "No." As to the police report describing Justice as "bow[ing] [his] head in shame" when he was placed under arrest, Justice explained that he was looking down at and watching

the officer who was patting him down. On cross-examination, Justice testified that he did not ask the officers where in Wisconsin those charges were from or what children had made those allegations and that he had never offered to make a statement between his arrest and the trial. On redirect examination, Justice testified he had no reason to believe he could trust law enforcement to take his statement, given the manner in which they had conducted the investigation.

¶51    In his postconviction motion, Justice argued that defense counsel's decision to present Justice's testimony about his arrest "opened the door to the State presenting evidence and arguments about his silence in the face of accusations at the time of his arrest, as well as not giving a statement before trial." Justice contended that this testimony effectively violated his Fifth Amendment right to silence. He asserted that the State did not use his testimony to impeach him but instead to draw the inference, in its closing argument, that Justice's silence was evidence of guilt. The circuit court agreed, concluding that defense counsel was deficient based on his misunderstanding of *Reichhoff v. State*, 76 Wis. 2d 375, 251 N.W.2d 470 (1977).

¶52    We conclude that defense counsel was not deficient for presenting Justice's testimony regarding the circumstances of his arrest because that was a reasonable strategic choice, given that his reasonable doubt defense included showing the lack of law enforcement investigation of Justice's actual guilt. At the *Machner* hearing, counsel testified that he sought to show that law enforcement did a "slipshod, inadequate and completely lacking investigation." In counsel's view, law enforcement "simply recorded statements, grabbed a few documents, directed a building manager to prepare a document and handed it to the [district attorney]. They did no actual truth testing, none." Counsel therefore wanted the jury to know "that this was a case that the police said, we don't care if he did it or

not, we're just going to get him charged" because law enforcement sought charges against Justice "without first getting his side of the story."

¶53     Defense counsel further testified that he "knew from day one [Justice] was going to testify" and "that the jury was going to evaluate his testimony." Counsel stated that he knew the police report's description of Justice bowing his head in shame was "going to be very damaging," and he explained that he chose to "take that on as early as [he] could and as aggressively as [he] could, understanding that the jury would hear that [Justice] didn't make a statement." Counsel also knew that the State "was going to be allowed to talk about [Justice's] physical reactions to the news [of his arrest]. That's admissible, that's not a Fifth Amendment protected thing." For this reason, counsel continued, he specifically wanted to "tackle[] it from the very beginning so the jury knew they were going to hear why [Justice] dropped his head."

¶54     Addressing the notion of whether Justice testifying about his arrest and what occurred afterward would have been inadmissible under *Reichhoff*, defense counsel stated: "If the State thought to bring it out on their own, absolutely, but if I brought it out, it's perfectly admissible." Counsel believed that *Reichhoff* allowed the State to "describe [Justice's] physical reaction to [law enforcement] placing him under arrest and telling him what the charges are. If *Reichhoff* says otherwise, then … at the time I was mistaken." Counsel added that he was also concerned the State would "do the usual questions about how you're getting on the stand, you're testifying about this, you've had the chance to hear every witness, read every police report and had two and a half years to think about what you're going to say," so counsel decided that he "wanted to get that all—I take the view that I don't want much hidden. I want the jury to hear everything." Counsel knew the jury would hear about Justice dropping his head in

shame, so he "wanted to deflect it, and that's why I started it. If I was wrong on that, then that's a … grave mistake on my part."

¶55 Although defense counsel "opened the door" to the State questioning Justice about his silence at the time of his arrest, counsel's decision to do so was a reasonable strategic choice. That is, counsel introduced the testimony to bolster Justice's defense, which included emphasizing the lack of police investigation. At trial, counsel questioned Detective Sergeant Daniel Goff, who was Officer Long's supervisor at the time of the investigation, on what law enforcement could have done but did not do in its investigation into Cliff's and James's allegations, such as seeking to speak with Justice. Counsel further supported Goff's testimony by eliciting from Justice that he had no idea why he was being arrested and that he was "flabbergasted," thereby showing that law enforcement never sought out Justice to get his side of the story even prior to arresting him. Counsel also sought to get ahead of the State introducing the damaging description of Justice bowing his head in shame by bringing up this action through Justice first and having him explain what he was actually doing.

¶56 Given the reasonable focus of the defense on the lack of law enforcement investigation, defense counsel's decision to present Justice's testimony in the manner he did was not objectively unreasonable. The fact that counsel may have misunderstood *Reichhoff*, by itself, does not make his strategic decision an objectively unreasonable one. And counsel did not completely misunderstand *Reichhoff*. Counsel understood *Reichhoff*'s primary holding that the State may not introduce testimony in its *case-in-chief* "relating to [the] defendant's silence, his failure to profess his innocence or his failure to deny his guilt at the time of arrest." *See Reichhoff*, 76 Wis. 2d at 377-78. The issue of

23

whether the State may describe a defendant's physical reaction to his or her arrest, however, is not explicitly addressed by *Reichhoff*.

¶57    In *Reichhoff*, the State introduced testimony from officers describing that the defendant "just put his wrists out like this for the handcuffs and never said a word" and that the defendant made no statements about his guilt and did not protest his arrest or attempt to engage in conversations about the offense with officers. *Id.* at 377 nn.1-2. Justice and the State argue over whether *Reichhoff* allows testimony about a defendant's physical reaction at the time of his or her arrest, but *Reichhoff* makes no mention of physical reactions and simply establishes, first, that the right to silence attaches at the time of arrest even though no interrogation or questioning by law enforcement occurs and, second, that the State may not introduce testimony relating to the defendant's silence at that time in its case-in-chief. *See id.* at 377-78; *State v. Brecht*, 143 Wis. 2d 297, 311, 421 N.W.2d 96 (1988).

¶58    If a defendant chooses to testify, however, the State may, on cross-examination, impeach a defendant with his or her pre-arrest silence or his or her post-arrest, pre-*Miranda*[6] silence. *Brecht*, 143 Wis. 2d at 314; *see State v. Sorenson*, 143 Wis. 2d 226, 257-58, 421 N.W.2d 77 (1988). Once a defendant testifies, any comment by the State on that defendant's pre-*Miranda* silence "may be explored and explained by the defendant's own counsel on redirect. This protection more than adequately shields against any potentially misleading inference which might be drawn from the prosecution's references." *Sorenson*, 143 Wis. 2d at 258.

---

[6] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

¶59     Thus, defense counsel knew that the State could not present any testimony relating to Justice's silence in its case-in-chief, but he purposely "opened the door" to the State's impeaching questions for objectively strategic reasons, mainly, to bolster his defense's reliance on the lack of law enforcement investigation. Further bolstering his defense, after the State's question eliciting Justice's admission that he did not provide a statement to law enforcement between his arrest and trial, defense counsel elicited from Justice his reason for not giving a statement to law enforcement—i.e., his lack of trust in law enforcement because of how it had conducted the investigation. Therefore, defense counsel's slightly incorrect understanding of **Reichhoff** does not turn his reasonable decision of introducing Justice's testimony into an unreasonable one. Accordingly, counsel was not deficient in this regard. Again, because Justice has not shown his trial counsel was deficient, we need not address the prejudice element. *See **Pico***, 382 Wis. 2d 273, ¶20.

### C.  School Personnel Testimony

¶60     Finally, the State argues that the circuit court erred by concluding that defense counsel was deficient by failing to object to Heidi Schmidt's and Sarah Thompson's testimony regarding Cliff's and James's character for truthfulness. At trial, Schmidt testified that her son and James were best friends, that she had known James for five years, and that James was generally truthful. On cross-examination, Schmidt admitted that she had "no idea whether or not anything ever happened in 2012 or 2013 that could have prompted criminal charges" and that she "love[d] [James] as a second mother."

¶61     Thompson testified that Cliff and James were students at the school where she taught, that they were her neighbors at one point, and that she had

known them for six or seven years. Defense counsel objected to Thompson testifying about Cliff's and James's character for truthfulness on foundation grounds, but the circuit court overruled his objection. On cross-examination, Thompson admitted that she did not know "what may have gone on in [Cliff's and James's] lives in 2012, 2013 … other than what [she] saw in school" and that she did not know "whether anything they've testified to in this case is accurate or not."

¶62 In his postconviction motion, Justice argued that Schmidt's and Thompson's testimony was "improper and objectionable" under WIS. STAT. § 906.08(1)(b). Pursuant to that statute, "Except with respect to an accused who testifies in his or her own behalf, evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." *Id.*; *see also* **State v. Haseltine**, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984) (concluding that a witness may not "give an opinion that another mentally and physically competent witness is telling the truth"). Justice contended that defense counsel never attacked Cliff's and James's character for truthfulness in general, and, therefore, counsel's failure to object to Schmidt's and Thompson's inadmissible testimony on § 906.08(1)(b) grounds was deficient.

¶63 At the *Machner* hearing, defense counsel admitted that he did not consider objecting to Schmidt's and Thompson's testimony on WIS. STAT. § 906.08(1)(b) grounds because he did not know whether the testimony was admissible. Counsel explained his view of the law as "when you take the stand, your character and your character for truthfulness is an issue, and so from my perspective logically … once you take the stand, character witness testimony as to your character for truthfulness or your reputation in the community for honesty are both allowed." The circuit court found that counsel was "unaware such evidence

26

was inadmissible under [§] 906.08(1)(b)" and, for that reason, concluded that counsel was deficient as a matter of law for failing to object to Schmidt's and Thompson's testimony.

¶64 We conclude that, regardless of whether defense counsel was deficient in failing to object to Schmidt's and Thompson's very brief testimony, that deficiency did not prejudice Justice's defense. Although Schmidt and Thompson testified that Cliff and James were generally truthful, both admitted they had no knowledge of the events that led to the charges in this case and knew nothing about the accuracy of Cliff's and James's allegations. Even if their brief and minimally probative testimony regarding Cliff's and James's character for truthfulness had been excluded, there is not a reasonable probability that the jury would have reached a different result, given the remaining compelling evidence from this five-day jury trial. This evidence included: Cliff's and James's testimony about the assaults and their forensic interviews; their parents' testimony about their family's close relationship with Justice; and Resch's and Dr. Thompson's testimony about how forensic interviews are conducted.

¶65 Thus, when compared with the remaining evidence, Justice has not shown that but for defense counsel's error by not objecting to certain portions of Schmidt's and Thompson's testimony, "there is a reasonable probability the jury would have had a reasonable doubt as to guilt." *See Sholar*, 381 Wis. 2d 560, ¶45.

## II. Excluded Evidence of James Viewing Pornography

¶66 Justice argues that the circuit court "greatly underestimated" the evidentiary value of James viewing pornography in 2014, "which prevented a fair and complete balancing analysis under [WIS. STAT. §] 904.03." He asserts that the evidence was highly relevant because it provided an alternative explanation for

both Cliff's and James's source of sexual knowledge despite their young ages, given that Cliff initially claimed the idea for touching people in a sexual manner came from James, and because Cliff and James "easily could have been describing pornography James viewed on his tablet, independently of anything related to Justice." Given the foregoing, Justice contends that the court applied an improper legal standard by concluding that any relevancy of the evidence was outweighed by the potential for unfair prejudice rather than the relevancy being "substantially" outweighed by the potential for unfair prejudice.

¶67 As noted above, Justice moved to admit the evidence of James viewing pornography on his tablet in 2014 (hereinafter, "the tablet evidence") as an alternate source of sexual knowledge for James. Although defense counsel did not believe the evidence was other-acts evidence, he contended that if it was other-acts evidence, then it was admissible as an alternative source of sexual knowledge under *State v. Pulizzano*, 155 Wis. 2d 633, 456 N.W.2d 325 (1990). At the hearing on the motion, Justice explained that Mitchell and Samantha told law enforcement that they found pornography on James's tablet in 2014. Justice contended that the evidence was important because it preceded the allegations that Cliff and James made in 2017 regarding viewing pornography with Justice.

¶68 When the circuit court asked whether anyone would testify about the nature of the pornography James viewed on his tablet, defense counsel responded that he expected "the parents to testify and they can answer those questions, because nobody's ever asked them in this investigation," and that "the police investigation is a failure in that regard because it failed to try to figure that out." Counsel added that "it's clear that porn usually involves sexual touching, and that's what [Cliff and James are] describing happened to them." The court then stated that the description needed to be more specific than just "sexual touching."

In response, counsel again stated that law enforcement had not investigated or followed up on what was on the tablet, and he argued that the evidence was not speculative because it was tied "back to earlier porn that's already being admitted."

¶69 The State responded that it was only James who had viewed pornography in 2014 and that his viewing of pornography was "not tied to the disclosures in 2017 in any way." The State explained that Mitchell and Samantha referred to the tablet evidence when "thinking back in time about things that they've experienced or … when you look back on things, you look for any red flag or anything that you could think of about whether something happened."

¶70 The circuit court found that James viewed pornography in 2014, after the assaults occurred; that what type of pornography he viewed was not described; and that what he viewed may or may not "parallel what the allegations are in the [c]omplaint." The court noted that James viewing pornography in 2014 "could equally be because of what occurred" in this case "or it could be because that served as a basis for [Cliff and James] coming forward three years later and making the allegations that result[ed] in these charges." The court, however, stated it would not "allow the [d]efense, in front of the jury, to call witnesses for purposes of basically investigation" because "without specifics as to what was viewed in 2014, that evidence can be anything." The court thus concluded that it would not admit the tablet evidence because "if it has any relevancy at all, [the evidence] would be outweighed by the potential for unfair prejudice."

¶71 Defense counsel then requested to take Officer Long's testimony prior to her testifying to the jury, seeking to ask Long whether she had attempted to obtain the tablet, whether she asked the parents what James viewed on it, and

whether she attempted to figure out if the source of Cliff's and James's allegations "could have been the porn they viewed that the parents found in 2014." Counsel explained that Long would respond "no" to these questions, which would further show a failure of investigation by law enforcement. The circuit court denied the request, stating that "the danger of unfair prejudice is too great, even with it being perhaps minimally relevant. There are too many pathways that the jury could take from that evidence that would be improper."

¶72 We conclude that the circuit court did not erroneously exercise its discretion by excluding the tablet evidence because it properly considered whether the relevance of the tablet evidence—with no details of what "pornography" was depicted—was substantially outweighed by the danger of unfair prejudice. WISCONSIN STAT. § 904.03 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by," among other things, "the danger of unfair prejudice, confusion of the issues, or misleading the jury." "The term 'substantially' indicates that if the probative value of the evidence is close or equal to its unfair prejudicial effect, the evidence must be admitted." *State v. Payano*, 2009 WI 86, ¶80, 320 Wis. 2d 348, 768 N.W.2d 832 (citation omitted; emphasis omitted). Unfair prejudice results when "the evidence 'influence[s] the outcome by improper means or if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case.'" *State v. Gutierrez*, 2020 WI 52, ¶35, 391 Wis. 2d 799, 943 N.W.2d 870 (alteration in original; citation omitted).

¶73 Here, the circuit court had before it an allegation that James viewed pornography on his tablet in 2014, but without any information regarding what he viewed, whether he viewed the same type of pornography that he alleged Justice

30

showed him, or if the acts depicted were similar to the alleged assaults by Justice. Considering that lack of information, the court did not want the jury speculating about what was viewed and those images' relation to the case, given its comments that the evidence could be "anything" and that it did not want defense counsel, "in front of the jury, to call witnesses for purposes of basically investigation." Thus, the court did not want the jury to base its decision on speculative evidence that may not have been related to the case at all. The fact that the court did not explicitly state that any relevance the tablet evidence may have had was "substantially" outweighed by the danger of unfair prejudice does not mean the court applied the improper legal standard. In fact, the court's comments indicate it believed the tablet evidence had little to no probative value. Therefore, the court did not erroneously exercise its discretion by considering the prejudicial effect of speculative evidence with little to no probative value.

¶74 We also reject Justice's contention that the circuit court's exclusion of the tablet evidence under WIS. STAT. § 904.03 violated his constitutional right to present a defense. Justice argues that the court's ruling prevented him from presenting the tablet evidence, cross-examining James regarding that evidence, and cross-examining Officer Long regarding law enforcement's failure to investigate. Justice contends that the tablet evidence "went to the core of the defense" because it provided an alternate source of sexual knowledge for Cliff and James and showed "law enforcement's failure to investigate innocent explanations."

¶75 In some circumstances, the application of an evidentiary rule may impermissibly abridge a defendant's right to present a defense. *Williams*, 253 Wis. 2d 99, ¶69. "[T]he test for whether the exclusion of evidence violates the right to present a defense" is "whether the proffered evidence was 'essential to'

the defense, and whether without the proffered evidence, the defendant had 'no reasonable means of defending his [or her] case.'" ***Id.***, ¶70 (citation omitted). Evidentiary rules that abridge a defendant's right to present a defense are those "that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary or disproportionate to the purposes they are designed to serve.'" ***Holmes v. South Carolina***, 547 U.S. 319, 324-25 (2006) (alteration in original; citation omitted). Under well-established evidentiary rules, however, "the Constitution permits judges 'to exclude evidence that is repetitive…, only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" ***Id.*** at 326-27 (alteration in original; citation omitted).

¶76 Here, the tablet evidence was not essential to Justice's reasonable doubt defense, and its exclusion did not leave Justice without reasonable means of defending his case. As noted above, defense counsel sought to show the inconsistencies and physical impossibilities in Cliff's and James's descriptions of the assaults and the lack of law enforcement investigation. Counsel implemented his defense by extensively and effectively cross-examining Cliff and James, by cross-examining Detective Sergeant Goff on the investigation, and by introducing testimony through Justice himself. Whether or not the tablet evidence was admitted, Justice's defense would have remained the same. Excluding the tablet evidence did not leave Justice without reasonable means of defending his case.

¶77 In addition to the foregoing, the tablet evidence had little to no probative value, given the lack of specificity as to what was depicted in the pornography and its questionable relation to the charges in this case. These considerations further establish that the tablet evidence was not essential to Justice's defense. Finally, because the tablet evidence lacked specificity and because the circuit court did not want the jury to speculate on the content of that

evidence, the court's exclusion of that evidence under WIS. STAT. § 904.03 was not an arbitrary or disproportionate application of that well-established evidentiary rule.

## CONCLUSION

¶78     In all, we conclude that Justice's trial counsel was not ineffective in any of the three ways that the circuit court determined counsel was ineffective, and we further conclude that the circuit court did not erroneously exercise its discretion by excluding the tablet evidence.  Consequently, we reverse the circuit court's order granting Justice a new trial and vacating his convictions, and we remand the case for the court to reinstate Justice's judgment of conviction.

*By the Court.*—Order reversed and cause remanded with directions.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.